IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| RAY E. TOLER & WILLIAM T. TOLER, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | 5:04-CV-45 (DF) |
| | : | |
| ENGELHARD CORPORATION, | : | |
| | : | |
| | : | |
| Defendant. | : | |

O R D E R

## I.      INTRODUCTION

Plaintiffs Ray E. Toler and William T. Toler ("Plaintiffs") brought this action seeking to reform or terminate a 1963 kaolin lease.  After an extended period of discovery, Defendant Engelhard Corporation ("Defendant") moved for summary judgment (doc. 72).  On December 22, 2005, this Court held a hearing on Defendant's summary-judgment motion.  At the conclusion of the hearing, the Court asked the parties to file supplemental briefs on the implied-duty-of-good-faith issues raised by Plaintiffs.

Before this Court are: (1) Defendant's Motion for Summary Judgment (doc. 72);  (2) Defendant's Motion in Limine to Exclude Testimony of Larry Keith Ennis (doc. 86); and (3) Defendant's Motion in Limine to Exclude Hearsay (doc. 109).  Based on the relevant law and the parties' submissions, Defendant's motions are granted in part and denied in part.

## II.   STANDARD OF REVIEW

The summary-judgment rule exists "to isolate and dispose of factually unsupported claims or defenses."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).   Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c) (West 2005); *see also* *Celotex Corp.*, 477 U.S. at 322.   A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   In reviewing a motion for summary judgment, a court must review all the evidence in the record while "draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also* *Maynard v. Williams*, 72 F.3d 848, 851 (11th Cir. 1996).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and entitle it to a judgment as a matter of law.   *Celotex Corp.*, 477 U.S. at 323 (internal quotation

marks omitted).  If the moving party discharges this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324-26.  This evidence must consist of more than mere conclusory allegations or legal conclusions.  *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).  Under this scheme, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

III.    **FACTUAL BACKGROUND**

In 1985, Plaintiffs inherited a 125-acre tract of land in Wilkinson County, Georgia from their uncle, Delmas Toler.  Plaintiffs inherited the land subject to a 1963 lease ("Lease" or "Toler-Engelhard Lease") executed between Delmas Toler and Defendant's predecessor-in-title.  Paragraph One of the Lease granted Defendant's predecessor (and therefore, Defendant):

> the "exclusive right to drill, prospect for, mine, remove, process and to acquire title to kaolin and other minerals located upon said lands, which are suitable for Tenant's purposes, with such other rights as are necessary or incidental to such purposes, said lands being as follows . . . 122.25 acres, more or less, net, subject to this contract. . . . "

(Ex. 1 to McKenzie Dep., doc 82, at ¶ 1.)

Paragraph Two of the Lease continues:

> For purposes aforesaid ~~and for the purposes of carrying on similar operations on other lands~~, Tenant shall have ample rights of ingress and egress over said lands, the right to make excavations for the mining and removal of minerals, the right to drain water and materials and to pile overburden at places most convenient to Tenant ~~whether removed from these or from other lands~~.

(Ex. 1 to McKenzie Dep., doc 82, at ¶ 2.) The Lease further provides for payment of $0.20 per cubic yard of crude kaolin mined and removed from the subject property (Ex. 1 to McKenzie Dep., doc 82, at ¶ 6.), an annual advance royalty payment of $900 dollars (Ex. 1 to McKenzie Dep., doc 82, at ¶ 5.), and a term of fifty years (Ex. 1 to McKenzie Dep., doc 82, at ¶ 9.)  The Lease did not contain an escalation or consumer-price-index clause.

Plaintiffs own the property immediately adjoining the 122.25 acres subject to the Lease ("leased premises").  Plaintiffs leased the adjoining property to Huber Kaolin Company ("Huber") in 1991 at the rate of $3.24 per cubic yard ("Huber Lease"). The Huber Lease contains a consumer-price-indexing provision.

In 1992, Defendant began mining Plaintiffs' property. To date, Defendant has removed approximately 1,805,000 cubic yards of kaolin; approximately 2,000,000 tons of kaolin remain on the leased premises.

In 2002, Plaintiffs' agent, Mr. Larry Ennis, encouraged Defendant to enter a kaolin-exchange agreement with Huber.  Huber needed more gray kaolin than was available on the property it leased from Plaintiffs ("Huber-Toler Tract"), and Defendant wanted to use the cream kaolin that Huber was mining, but not using.  Plaintiffs supported the agreement

4

because they would receive payment for the cream kaolin mined by Huber in exchange for

Defendant's gray kaolin at the (higher) royalty rate contained in the Huber-Toler Lease.

In a letter dated December 16, 2002, Plaintiffs sent Huber a letter regarding the

kaolin-exchange proposal between Defendant and Huber. The letter reads, in relevant part:

> To facilitate the exchange, we understand that either company, or their
> contractors, may periodically enter onto the referenced land leased by either
> company for the purpose of stripping overburden, extracting, loading and/or
> hauling kaolin.
> Irrespective of this fact, the named Lessee under the terms of the referenced
> lease will remain responsible for ensuring payment . . . and for ensuring
> compliance with all other terms and conditions of the referenced lease,
> including, but not limited to, reclamation of mined areas.

(Ex. 11 to McKenzie Dep., doc 82, at ¶ 2.)

In January 2003, Defendant and Huber entered a kaolin-exchange agreement. In

March 2003, Defendant moved 105,000 cubic yards of overburden from the leased premises

to Plaintiffs' adjacent land. In the fall of 2003, Defendant and Huber began negotiating a

2004 exchange agreement. In contemplation of the 2004 exchange agreement, Huber sent

another letter to Plaintiffs requesting their acknowledgment of that agreement. (McKenzie

Dep., Ex. 12.) In December 2003, before the 2004 exchange agreement was finalized,

Defendant again moved overburden from the leased premises to the adjacent Toler-Huber

Tract. Defendant continued to move overburden to Plaintiffs' adjacent land through

January 12, 2004, when Plaintiffs complained to Defendant.

## IV.    LEGAL DISCUSSION

### A. Unconscionability Claim

Defendant first asserts that it is entitled to summary judgment on Plaintiffs' unconscionability claim.

Unconscionability is a question of law for the court to decide. ***Zepp v. Mayor & Council of Athens***, 348 S.E.2d 673, 679 (Ga.Ct. App. 1986). In Georgia, an "unconscionable" contract is one that "no sane man not acting under a delusion would make and that no honest man would take advantage of . . . [i]t is a contract that is abhorrent to good morals and conscience. It is one where one of the parties takes a fraudulent advantage of another." ***Garbutt v. Southern Clays, Inc.***, 894 F. Supp. 456, 463 (M.D. Ga. 1995) (internal quotations and citations omitted). The basic test of unconscionability is whether, "in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable *under the circumstances existing at the time of the making of the contract*." ***R.L. Kimsey Cotton Co. v. Ferguson,*** 214 S.E.2d 360, 363 (Ga. 1975) (emphasis added); *see also* ***William J. Cooney, P.C. v. Rowland***, 524 S.E.2d 730, 733 (Ga. Ct. App. 1999); ***BMW Financial Services, Inc. v. Smoke Rise Corp.***, 486 S.E.2d 629, 630 (Ga. Ct. App. 1997). The court is not authorized to "declare a contract void merely because it may be unwise or even foolish. Folly is not in all cases fraud. That it may be unwise or disadvantageous or place a hardship on one party furnishes no reason for not enforcing the contract as made." ***Bright v. Stubbs Properties, Inc.,*** 210 S.E.2d 379, 380 (Ga.

Ct. App. 1974) (internal citations and quotations omitted).

In support of their argument that the Lease rate ($0.20 per cubic yard) is unconscionably low, Plaintiffs argue that the 1963 lease was actually "an *option* to enter into a lease agreement at a later date." (Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J., doc. 89, at 25.) Based on this logic, Plaintiffs reason that the unconscionability of the Lease should not be measured in light of the kaolin-industry conditions in 1963. Rather, Plaintiffs argue that unconscionability should be measured against the industry practice in 1992—the year Defendant supposedly decided to exercise its option rights. (Pls.' Br. 25.) Plaintiffs allege the market price of kaolin in 1992 was between $3 and $5 per cubic yard, which far exceeded Plaintiffs' $0.20 per-cubic-yard rate.[1] According to Plaintiffs, the absence of a royalty-index provision in the Lease caused this immense disparity. Plaintiffs further allege that this disparity renders the Lease price unconscionable, and seek either rescission of the Lease or "equitable reformation" of the $0.20 rate. (Pl.'s Br. 25-26.)

Defendant asserts that the unconscionability of the Lease should be evaluated in light of the kaolin-market conditions that existed in 1963—the year Delmas Toler executed the Lease with Defendant's predecessor. (Def.'s Br. Supp. Mot. Summ. J., doc. 73, at 14.) Defendant further claims that, when the Lease is viewed in light of the kaolin market in

---

[1] The Court recognizes that Defendant disagrees with Plaintiffs' assessment of the current price of kaolin. The Court need not determine the exact price of kaolin, however, to address the unconscionability question. The Court assumes for the purposes of this Order that the contract price of $0.20 per cubic yard is well below the current-market price.

1963, the $0.20 rate is not unconscionable.  Defendant points to 46 kaolin leases executed by Defendant's predecessor between 1961 and 1964—all of which contain rates "similar" or "identical" to Plaintiffs' royalty rate.  (Def.'s Br. 4.)  Defendant also defends the non-inclusion of a royalty or escalation clause by showing that, of the 46 leases, only two contained any type of index or escalation provision.  (McKenzie Supp. Aff. ¶ 3.)

Plaintiffs have not raised a genuine issue of material fact as to their unconscionability claim.  Plaintiffs do not allege any of the elements of unconscionability were present when Delmas Toler executed the 1963 lease. Plaintiffs do not argue that Defendant took fraudulent advantage of Delmas Toler, or that the contract was a product of their uncle's delusion, or that the contract terms were, at that time, abhorrent to good morals and conscience.  Instead, Plaintiffs rely on their option-contract argument—an argument completely lacking in legal support.

Here, the Court will evaluate Plaintiffs' unconscionability claim in light of the kaolin-industry conditions in 1963.  The $0.20 rate in Plaintiffs' 1963 lease was similar or identical to the rates in 46 kaolin leases entered into by Defendant's predecessor between 1961 and 1964.  (McKenzie Supp. Aff. ¶ 3.)  Of the foregoing leases, only two contained an index or escalation provision.  (McKenzie Supp. Aff. ¶ 3.)  Furthermore, Delmas Toler negotiated the contract provisions in 1963 and "accepted without complaint the benefits of the lease for [ ] twenty-one years."  (Def.'s Br. Supp. Mot. Summ. J., doc. 73, at 7.)

Based on a thorough evaluation of the evidence in the record, this Court cannot

8

reasonably conclude that the $0.20 rate was one-sided and unconscionable <u>in 1963</u> in light of the price of kaolin, general market conditions, and industry practice at that time. It certainly may be folly for one to negotiate a fifty-year lease without including an index or escalation provision; yet, under these facts, such folly does not amount to fraud or unconscionability. Accordingly, Defendant is entitled to summary judgment on Plaintiffs' unconscionability claim.[2]

## B. "Material Breach" Claim

Defendant next alleges that it is entitled to summary judgment on Plaintiffs' breach of contract claim. Defendant argues that: (1) Defendant did not breach the Lease; and (2) even if Defendant breached the Lease, the breach was not material; therefore, rescission or reformation of the Lease is not warranted.

### Breach of Contract

In Georgia, questions regarding contract construction are determined as a matter of law. *Smith v. Freeport Kaolin Co.*, 687 F. Supp. 1550, 1553 (M.D. Ga. 1988). Contract construction requires a three-step analysis. *Travelers Ins. Co. v. Blakely*, 342 S.E.2d 308, 309 (Ga. 1986). First, the Court decides whether the contract is ambiguous. *Id.* Second, if the contract is ambiguous, the court applies the rules of contract construction to resolve the ambiguity. *Id.* Third, if the ambiguity remains after use of the construction rules, the

---

[2] In light of the Court's determination that the contract is not unconscionable under Georgia law, the Court need not reach Defendant's additional arguments based on the statute of limitations and the doctrines of waiver and estoppel. *See* Def.'s Br. 20-23.

meaning of the contract is submitted to the jury.  **Id.**

### Ambiguity

"Ambiguity exists when the language may be fairly understood in more than one way; language is unambiguous if it is capable of only one reasonable explanation." *Eckerd Corp. v. Alterman Prop., Ltd.*, 589 S.E.2d 660, 665 (Ga. Ct. App. 2004) (internal citations omitted).  No construction by the court is "required or even permissible when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation." *Cincinnati Ins. Co. v. Davis*, 265 S.E.2d 102, 105 (Ga. Ct. App. 1980).

In this case, both parties argue that the language in Paragraph Two of the Lease is unambiguous.  Paragraph Two reads:

> For purposes aforesaid ~~and for the purposes of carrying on similar operations on other lands~~, Tenant shall have ample rights of ingress and egress over said lands, the right to make excavations for the mining and removal of minerals, the right to drain water and materials and to pile overburden at places most convenient to Tenant ~~whether removed from these or from other lands~~.

(Ex. 1 to McKenzie Dep., doc 82, at ¶ 2.)  The parties' arguments as to *why* the foregoing paragraph is unambiguous, however, markedly differ.  Plaintiffs argue that "the definition of terms in the 1963 Toler Agreement show the agreement clearly forbids the removal of overburden from the 122-acre tract."  (Pl.s' Br. 10.)  Specifically, Plaintiffs contend Defendant did not have the right to move overburden to lands not covered by the Lease because the Lease only gave Defendant rights as to 122 acres.  In other words, "Delmas

10

Toler could only give rights with respect to his 122 acres." (Pls.' Surreply Br. 4.) Defendant argues that "the language of the lease plainly and without limitation grants Engelhard the right 'to pile overburden at places most convenient' to Engelhard . . . if it facilitate[s] mining of the Engelhard-Toler tract." (Def.'s Br. 23.)

While it may appear that the "*places* most convenient" language of the Lease is subject to more than one plausible interpretation, the Court finds the foregoing phrase unambiguous. Paragraph 1 of the Toler Lease explicitly provides: "[o]wner has granted . . . to Tenant an exclusive mineral and mining lease in and to the lands hereinafter described . . . said lands being as follows . . . 122.25 acres, more or less, net, *subject to this contract*." In light of foregoing provision, the phrase "*places* most convenient" means Defendant acquired the right to pile overburden at the most convenient location *on the 122.25 acres* leased from Plaintiffs.[3]

The Court's inquiry does not end here, however. The Court must address the remaining issue raised by the parties' briefs: whether the parties modified the original Lease to allow Defendant to remove overburden from the leased premises.

_____

[3] Even if this Court found the "places most convenient to Tenant" language ambiguous, this Court would still conclude that Defendant breached the Lease by removing overburden from the leased premises to adjacent lands under the "absurd result" rule of contract construction. To interpret the Lease to mean that Delmas Toler granted Defendant the right to pile overburden on land outside the leased premises would lead to an absurd result. This result would be absurd because a lessee's rights under a lease of real property only extend to the property subject to the lease. *See Tudor v. Am. Emp. Ins. Co.*, 173 S.E.2d 403, 404 (refusing to give language of insurance policy "a construction which would render it meaningless and ineffective or which would lead to an *absurd result*").

**Contract Modification**

The parties to a contract are free to modify or change the terms of the written contract by a subsequent parol agreement, if the agreement is founded on sufficient consideration. *Ryder Truck Lines, Inc. v. Scott*, 201 S.E.2d 672, 675 (Ga. Ct. App. 1973).

Here, the Court's construction of the Lease's language has no bearing on the breach issue <u>if</u> Plaintiffs and Defendant modified the terms of the Lease by a subsequent parol agreement. Irrespective of whether Defendant had the right to move overburden onto Plaintiffs' adjacent land under the original Lease, the parties later might have modified the Lease to allow Defendant to move overburden from the leased premises to Plaintiffs' adjacent land. In defense of its decision to move the overburden, Defendant alleges: (1) Plaintiffs' agent, Mr. Ennis, offered to permit Defendant to pile overburden on the Huber-Toler Tract in order to facilitate the kaolin-exchange agreement between Huber and Defendant; and (2) the language in the letter from Plaintiffs to Huber ostensibly grants both Defendant and Huber the right to "stri[p] overburden"[4] from either property. In response, Plaintiff maintains: (1) the language of the original Lease proscribed the removal of overburden from the 122-acre tract; and (2) Plaintiffs repeatedly rejected Defendant's requests to remove overburden, including a request dated October 17, 2003.

The parties' foregoing contentions raise issues of material fact regarding the

---

[4] According to Defendant, the phrase "stri[p] overburden" implies "the removal/digging and relocating/piling overburden in another location to enable a kaolin company to mine the usable kaolin." (Def.'s Br. 11 n. 6.)

existence of a subsequent parol agreement modifying the terms of the original Lease.  Thus, the Court hereby finds that the breach of contract issue presents a jury question.  If the jury finds that the terms of the original contract were modified, and that Defendant breached the newly-modified contract, the jury will address the issues attendant to the breach of contract question, including whether the breach was material or whether Defendant substantially complied with the terms of the Lease.[5]

Accordingly, Defendant's Motion for Summary Judgment with respect to Plaintiffs' material-breach claim is **DENIED**.

## C.  Breach of Implied Duty of Good Faith and Fair Dealing

Every contract imposes upon each party an implied duty of good faith and fair dealing.  *West v. Koufman*, 384 S.E.2d 664, 666 (Ga. 1989).  "This implied duty 'requires both parties to a contract to perform their promises and provide such cooperation as is required for the other party's performance.'" *Camp v. Peetluk*, 585 S.E.2d 704, 708 (Ga. Ct. App. 2003) (quoting *Physician Specialists in Anesthesia v. MacNeill*, 539 S.E.2d 216, 224 (Ga. Ct. App. 2003)).  Under Georgia law, "the common law requirement of good faith and fair dealing in the performance of a contract" does not create "an independent cause of action apart from breach of contract."[6] *Stuart Enter. Intern, Inc. v. Peykan, Inc.*, 555 S.E.2d

---

[5] *See Rome Healthcare LLC v. Peach Healthcare System, Inc.*, 590 S.E.2d 235 (Ga. Ct. App. 2003); 15 Williston on Contracts § 63:3 (4th ed.).

[6] An exception to this general rule exists "where there is a special relationship between the parties that creates an independent duty."  *Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*, 136 F. Supp. 2d 1340, 1354 (N.D. Ga. 2001).  The Court finds that no such special relationship exists between

881, 883 (Ga. Ct. App. 2001); *see also* ***Am. Oil Co. v. Roper***, 14 S.E.2d 145, 148 (Ga. Ct. App. 1941). Therefore, a party must prove its breach-of-contract claim before it can seek to prove that the breach was in bad faith. *See generally* ***Greenwald v. Columbus Bank & Trust Co.***, 492 S.E.2d 248 (Ga. Ct. App. 1997). Whether a party has breached the implied duty of good faith and fair dealing is generally a question of fact. ***Peetluk***, 585 S.E.2d at 708.

The Court now turns to the implied-duty arguments addressed by Plaintiffs in their supplemental brief (doc. 121). Plaintiffs essentially argue that Defendant breached the implied covenant of good faith and fair dealing by: (1) removing overburden from the leased premises without Plaintiffs' authorization; and (2) refusing to increase Plaintiffs' royalty rate. The Court will address each argument in turn.

### 1. Overburden Removal

In addition to their argument that Defendant's overburden removal was a material breach of contract, Plaintiffs argue that this alleged material breach was in bad faith. (Pls.' Supp. Br. 2.) In support of this contention, Plaintiff points to letters written to Mr. Joe McKenzie, Defendant's agent, and phone calls wherein Plaintiffs specifically informed Defendant that it did not have permission to remove overburden from the leased premises. (Pls.' Supp. Br. 2-4.) Defendant maintains that its removal of the overburden was authorized by Plaintiffs' agent, Mr. Ennis. (Def.'s Mem. 6.)

The Court finds that a genuine issue of material fact remains as to whether

---

the parties in this action.

Defendant's alleged breach of the Lease was in bad faith.  In their supplemental brief, Plaintiffs cite numerous occasions on which Defendant was notified that Plaintiffs objected to the removal of overburden from the leased premises.  (Pls.' Supp. Br., doc. 121, at 2-4.) While Defendant has also submitted evidence to support its contention that it acted in good faith, this evidence does not entitle Defendants to judgment as a matter of law on this issue because all reasonable inferences must be drawn in Plaintiffs' favor.  Accordingly, the Court concludes that Defendants are not entitled to summary judgment on this bad-faith claim.

### 2.  Refusal to Increase Royalty Rate

Plaintiffs also allege that Defendant's refusal to increase the $0.20 rate in the lease violated the implied duty of good faith and fair dealing.  In response to this argument, Defendant insists that, "under Georgia law and the plain terms of the Lease," it had no obligation to increase the $0.20 royalty rate.

Plaintiffs' bad-faith contention above is a contract-reformation argument for which there is no legal basis.  The Court notes once again that it does not have the authority to reform a validly-executed contract.  The parties are bound by the contract terms as written, and Defendant is under no obligation to modify the lease terms.  In other words, the Court cannot, and will not, save Plaintiffs from a bad bargain.

### D. Motion in Limine to Exclude Testimony of Larry Keith Ennis

The Court now addresses Defendant's Motion in Limine to Exclude Testimony of Larry Keith Ennis (doc. 86).  Mr. Ennis is Plaintiffs' proposed expert witness.  Defendant

seeks to exclude from the Court's consideration during Summary Judgment or at trial the

following opinions offered by Mr. Ennis in his Expert Witness Report :

1.   20¢ per cubic yard for the kaolin from the Toler tract is an unconscionably low price;

2.   The current fair market value for quality kaolin ranges from $3.00 to $6.00 per cubic yard, depending upon how many factors such as quality and cost of mining;

3.   During 1992, when Engelhard started to mine the Toler property, the fair market value of kaolin was between $2.00 and $4.00 per cubic yard;

4.   It is my opinion that the fair market value of "fill dirt" or overburden is between 50¢ per cubic yard and $2.00 per cubic yard;

5.   It is my opinion that the cost to move overburden or fill dirt is 85¢ to $1.25 per cubic yard and the grading cost involved in spreading fill dirt or overburden is from $1,500 to $2,500 per acre;

6.   53¢ per cubic yard is the current average royalty rates [sic] paid by Engelhard after adjustment and amendments on the nine other lease they have identified that they have mined or are mining . . . and the 2004 average royalty rate paid under these other leases is at least 81¢ per cubic yard compared with Plaintiffs' lease which is still at 20¢ per cubic yard.

(Ennis Expert Witness Rep., doc. 87, Ex. A, at 3-4.)  Defendant also seeks to exclude Mr.

Ennis's opinion that Defendant breached the Lease by violating the alleged overburden

restriction.  Given the Court's above rulings on Plaintiff's unconscionability, breach-of-

contract, and implied-duty claims, the Court finds that opinions #1, 2, 3, and 6 regarding

the fair market value and current royalty rates of kaolin are no longer relevant; thus they

are hereby excluded.   The Court will address Mr. Ennis's qualifications and the

admissibility of Mr. Ennis's remaining opinions below.

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Rule 702

provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (West 2005).  To determine the admissibility of expert testimony, trial courts consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir. 1998).  "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence."  *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1306 (11th Cir. 1999).  The Court will first address whether Mr. Ennis is qualified to testify competently about the matters he addressed in his Expert Witness Report (doc. 87, attach. 1).

### 1. Mr. Ennis's Qualifications

Plaintiff claims that Mr. Ennis's knowledge, skill, and work experience, along with his undergraduate degree, qualify him as a kaolin expert.  Mr. Ennis received a Bachelors

of Science degree in Geology from the University of Georgia in 1991.  (Ennis Expert Witness Rep., doc. 87, attach. 1, at 1.)  Mr. Ennis claims that his opinions regarding Defendant's breach of the Lease's alleged overburden restriction, the fair market value of overburden and the costs associated with moving and spreading overburden are based on his "background and experience with the kaolin business."  (Ennis Expert Rep. 4.)  While Mr. Ennis does have some experience in dealing with the acquisition of kaolin properties, he has no work experience in the realm of mineral valuation or contract interpretation; thus, Mr. Ennis's limited experience in these areas does not qualify him as an expert on these issues.

Even if Mr. Ennis possessed the requisite qualifications to testify as a kaolin expert, his testimony would still be excluded because he cannot meet the second and third admissibility requirements.  *See Harcros Chems.*, 158 F.3d at 562.

### 2. Mr. Ennis's Methodology

To meet the second admissibility requirement for expert testimony, the expert's methodology must be "sufficiently reliable."  *Id.*  Here, because the Mr. Ennis employed no recognizable methodology in arriving at his estimate of the current fair market value of fill dirt or overburden (Opinion #4) or of the average cost of moving and spreading overburden (Opinion #5), the Court finds this testimony unreliable and inadmissible.

"The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony."  *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004).  Even if an expert's own experience

18

is the basis of his or her opinions, the expert's preparation should still be "of a kind that others in the field would recognize as acceptable." *Id.*  Above all else, "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well reasoned, and not speculative before it can be admitted." *Id.*

The Court cannot conclude that Mr. Ennis's fourth and fifth opinions are properly grounded, well reasoned, and not speculative.  As the Court noted above, Mr. Ennis lacks the knowledge, skill, experience, training or education to testify about the current fair market value of overburden and the cost of moving and spreading overburden.  Moreover, Mr. Ennis's conclusions have very little factual support, and are unsubstantiated by any identifiable principles and methods of appraisal.  Thus, this testimony is excluded.

### 3. Assistance to the Trier of Fact

The final requirement for the admissibility of expert testimony is that it "assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue." *See Harcros Chems.*, 158 F.3d at 562.  In the Court's view, even if Mr. Ennis was qualified, and his methodology was sound, his fourth opinion, fifth opinion, and his testimony regarding Defendant's alleged violation of the overburden restriction would still be excluded because this testimony does not assist the trier of fact.

Generally, an expert may testify as to his opinion on an ultimate issue of fact.  Fed. R. Evid. 704.  An expert's legal conclusion, however, is not admissible.  *Cook v. Sheriff of*

*Monroe Cty, Fla.*, 402 F.3d 1092, 1112 n. 8 (11th Cir. 2005).  "[A]n expert witness may not substitute for the court in charging the jury regarding the applicable law."  *Id.*

With respect to issues of fact, expert testimony should demonstrate "scientific, technical, or other specialized knowledge."  *See* Fed. R. Evid. 702.  Such testimony should explain information "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).

Mr. Ennis's legal opinion that Defendant breached the Lease by violating the alleged overburden restriction is a purely legal conclusion and was presented without any supporting factual basis.  Because this opinion merely tells the Court or the jury what result to reach, it is not helpful, and is therefore inadmissible.  *See* Fed. R. Evid. 704, advisory committee's note.  Thus, this testimony will also be excluded.

Mr. Ennis's opinion regarding the fair market value of overburden and the cost of moving and spreading overburden is based on a personal experience that transpired ten years ago, and a phone call to an individual who provided Mr. Ennis with his current rates for moving and spreading overburden.  (Def.'s Mem. Supp. Mot. Exclude, doc. 87, at 11; Ennis Expert Rep. 5.)  The above testimony involves no "scientific, technical, or other specialized knowledge," and offers nothing "beyond the understanding and experience of the average citizen."  Because this testimony requires no expert reasoning or knowledge, it will not help the trier of fact to determine a fact in issue; thus, this opinion is also excluded.

Based on the Court's foregoing conclusions, Defendant's Motion in Limine to Exclude Testimony of Larry Keith Ennis is hereby **GRANTED**.

**E. Defendant's Motion in Limine to Exclude Irrelevant, Inadmissible Hearsay**

The Court now turns to Defendant's Objection and Request to Exclude Irrelevant, Inadmissible Hearsay (doc. 109).  Defendant seeks to exclude the opinions, quotes, and excerpts contained in the 1985 book "Kaolin—A Glacier's Gift to Georgia" and relied upon by Plaintiffs in their Brief in Opposition to Defendant's Motion for Summary Judgment. Defendant also seeks to exclude a newspaper quote taken from a 1983 article in the *Atlanta Journal.*

Plaintiffs relied on excerpts from the 1985 book and the newspaper article, above, to support their arguments that: (1) the Lease is unconscionable; and (2) Defendant breached the implied duty of good faith and fair dealing by refusing to increase Plaintiffs' $0.20 rate.  The Court has already: (1) rejected Plaintiffs' unconscionability argument; and (2) rejected Plaintiffs' bad-faith-refusal-to-modify argument.  Thus, the Court need not address the admissibility of the evidence, above.

Accordingly, the Court's conclusions on these issues renders Defendant's Motion in Limine to Exclude Hearsay **MOOT**.

**V.   CONCLUSION**

Based on the relevant law and the arguments considered by the Court and set forth above, the Court hereby DECLARES:

1.      Defendant's Motion for Summary Judgment as to Plaintiffs' unconscionability claim is hereby **GRANTED**.

2.      Defendant's Motion for Summary Judgment as to Plaintiffs' material-breach-of-contract claim is hereby **DENIED**.

3.      Defendant's Motion for Summary Judgment as to Plaintiffs' implied-duty claims is hereby **GRANTED IN PART,** and **DENIED IN PART**.

4.      Defendant's Motion in Limine to Exclude Testimony of Larry Keith Ennis is hereby **GRANTED**.

5.      Defendant's Motion in Limine to Exclude Hearsay is **MOOT**.


SO ORDERED, this 20th day of March, 2006.


**/s/ Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/jab